**In the Matter of J.B.C.**

No. 2–06–175–CV.

Court of Appeals of Texas,
Fort Worth.

July 26, 2007.

Panel F: HOLMAN, GARDNER, and McCOY, JJ.

## OPINION

BOB McCOY, Justice.

### I. Introduction

In three issues, Appellant J.B.C. appeals the trial court's decision that he engaged in delinquent conduct by committing murder. We affirm.

### II. Factual and Procedural Background

In spring 2005, Kris Lee opened up her home to care for her two grandsons (ages nineteen and sixteen) while their mother, Lee's daughter, was in prison for aiding and abetting a drug offense. Not having had the opportunity to get to know either boy, Lee saw the opportunity as a new lease on life. On July 6, 2005, Lee was found dead on her bedroom floor from a single gunshot wound to the back of her head.

The State presented a great deal of circumstantial evidence against J.B.C. at trial, from which the jury found beyond all reasonable doubt that J.B.C. had engaged in delinquent conduct by committing murder.

### A. Introduction

Michael C.[1], the older of Lee's two grandsons, arrived first and did not present Lee with many problems. It was after J.B.C. arrived that family members and neighbors indicated that problems arose. By all accounts, including the testimony of J.B.C. himself, J.B.C. was disrespectful to his grandmother and her home. He

Swanda & Swanda, P.C. and Dean M. Swanda, Arlington, TX, for Appellant.

Tim Curry, Criminal District Atty., Charles M. Mallin, Assistant Criminal District Atty. and Chief of the Appellate Section, Kimberly Colliet Wesley, Sheila Wynn, and George Dewayne Huston, Assistant Criminal District Attys., Fort Worth, TX, for Appellee.

1. Michael, J.B.C.'s older brother, was nineteen at the time of the shooting, and will, therefore, be referred to as Michael rather than by his initials throughout this opinion.

During trial, Michael was referenced by witnesses during testimony as Michael, Joshua, Josh, and "Bones."

cussed at and argued with her. He trashed her house, broke her belongings, and essentially confined her to living in her bedroom. He smoked marijuana in her presence, and he used methamphetamines in her home.

### B. Events of July 6, 2005

On the morning of July 6, 2005, Michael was playing video games with Shawn Franks, Jeremy Bonsignore, and Bryan Frailey at Franks's house, which was just down the street from the home Lee shared with her grandsons. The boys decided to go to Lee's house to get J.B.C. and his video game, "Madden 2005," so that together they could return to Franks's house to smoke some pot and play the video game. Upon arriving at the house, the four boys went to the back door. After banging on the door and getting no immediate answer, Michael went around to the front door. The other three boys stayed at the back door. With a "ghostly look" on her face, Lee eventually answered the back door and, without saying a word, let the boys in the house. Lee immediately went back down the hallway towards her bedroom.

Apparently the noise created by the four boys as they came in the house awakened J.B.C., who had been asleep on the living room couch. J.B.C. used the living room as his bedroom. One of the boys informed J.B.C. that his pot plant was missing from the backyard. Frailey testified that he heard J.B.C. mutter angrily "I bet my fucking granny did it" referring to the missing pot plant. J.B.C. admitted at trial that he had said he thought his "fucking granny did it."

J.B.C. got up from the couch and went down the hall to go get dressed. While J.B.C. was out of the room getting dressed, the other four boys remained in the living room and watched T.V. while waiting for J.B.C. to return clothed and with the video game.[2] None of the boys heard any unusual sounds or a gunshot while J.B.C. was down the hallway, though Frailey testified that he heard what may have been a door shutting.

J.B.C. testified that after waking up, he went to Michael's room and took no more than two minutes getting dressed before returning to the living room with the video game in hand. Then, J.B.C. testified, he and Franks walked back down the hallway to Lee's bedroom so that he could tell his grandmother that he was leaving. According to J.B.C., he entered his grandmother's bedroom, found a note on the bed, and read it as he walked back out to the living room. Written in several different ink colors, the note read:

> Dear Jake and Josh,
>
> Do not think this is your fault, I'm just so tired of seeing people hurt people—especially family. I can't believe my own family can believe the lies someone is making up about me. Hope you have a wonderful life.
>
> Love always,
>
> Granny
>
> xoxoxo
>
> P.S. Josh: I told you I had somewhere better to go!

Realizing that she may have been referring to "heaven" and committing suicide when she said "somewhere better to go," J.B.C. said he ran back to Lee's room. He first searched his grandmother's closet before finding her face down on the other

---

**2.** By most accounts there were only five boys in Lee's house that day—J.B.C., Michael, Franks, Bonsignore, and Frailey. Only J.B.C. testified that a sixth person, Eric Ramos, was also present. None of the other boys mentioned Ramos, and Ramos was not called to testify in this case.

side of the bed. A handwriting analyst determined that Lee in fact wrote the note. J.B.C.'s prints were not among the suitable latent fingerprints found on the note.

In contrast to J.B.C.'s account, as detailed above, the testimony of Frailey, Bonsignore, and Franks adduced at trial supports the theory that J.B.C. was absent for more than the two minutes he claimed, and that Michael was the one who found and initially read the alleged "suicide note."

According to Frailey, after J.B.C. spent about ten minutes down the hall, he went outside and messed around with a metal bucket. Frailey also testified that it was he who followed Michael down the hallway to Lee's room while J.B.C. was, he guessed, still outside. Michael discovered the note on Lee's bed and said that he needed to show it to J.B.C. Michael and Frailey walked back out to the living room to show J.B.C. the note. J.B.C. responded that his grandmother hadn't left, she was hiding. J.B.C. denied at trial ever saying that he thought she was hiding. Frailey testified that everybody then followed J.B.C. down the hall to Lee's bedroom.

Similarly, according to Bonsignore, the next time he saw J.B.C., J.B.C. was coming inside through the back door with his dog. After coming back inside, J.B.C. washed his hands in the kitchen sink. Bonsignore testified that he did not know how J.B.C. had gotten outside. He further testified that Michael and Frailey went down the hallway while he was in the kitchen talking to J.B.C. Michael came back out reading a note he found in Lee's bedroom. Commenting that the letter sounded serious, Bonsignore testified that Frailey looked out the window to see that Lee's car was still in the driveway. Everyone except for Bonsignore went down the hallway to Lee's bedroom.

According to Franks, J.B.C. was the only one who had left the living room, and he spent about three to five minutes down the hallway. However, he too identified Michael as the one who returned with the note in his hands. At trial, Franks could not explain how Michael had gotten the note, or say for certain that Michael had actually been in the living room the entire time.

The boys found Lee's body face down between the wall and the side of the bed. J.B.C. testified that he screamed "Granny, Granny, Granny" a couple of times, and after getting no response, he ran out of the bedroom. J.B.C. said that he did not try to do anything to help her because he was scared. When J.B.C. said that his grandmother was dead and had killed herself, everyone got out of Lee's house. J.B.C. then ran to the neighbor's house, screaming that his granny was dead, and asked that they call the police. Bonsignore testified that he told the grand jury that J.B.C. said "I think my granny shot herself." J.B.C. denied saying that he told anyone he thought his grandmother shot herself. James Ludwick, Lee's neighbor, went to the house to help. He found Lee's body behind the bed. When he tried to lift her, a gun came out from underneath her body. Not until the paramedics arrived and turned Lee's body over did Ludwick remember seeing any blood.

Paramedics arrived on the scene within minutes of being dispatched to what they believed was a cardiac arrest. It was only after paramedic Todd Farmer turned over Lee's body that he saw that her hair was matted with blood and brain matter was running from her nose. Her skin was still warm to the touch. Paramedics phoned doctors at Harris Hospital and had Lee pronounced dead on the scene.

## C.  The Autopsy

Medical examiner Dr. Gary Sisler performed the autopsy on Lee's body on July 7, 2005. Dr. Sisler testified that Lee had a bruise on the outside of her right forearm, a bruise on her right optical orbit, and a laceration and gunshot wound to the back of the right side of her head. The bruise on her arm was consistent with a defensive wound. The laceration matched the butt of the gun in size. In fact, it was Dr. Sisler's assessment that the gun was a possible cause of the laceration. Still at that point, Dr. Sisler testified, he could not rule out suicide. However, once Dr. Sisler pulled back the skin from Lee's scalp, he discovered wounds separate from the gunshot wound that led him to rule out suicide as a cause of death. He observed a bruise over the left side of the head and fractures of the sagittal suture that were not visible before pulling back the scalp. One skull fracture, approximately five centimeters in length, was in the middle of the back of the head and extending upwards. The second fracture was on the right occipital bone at the base and measured eight centimeters in length. Dr. Sisler did not believe that either of these fractures resulted from the gunshot wound. Furthermore, extensive hemorrhaging showed that the injuries occurred while Lee had blood pressure and was, therefore, alive. Dr. Sisler determined that while the cause of death was a single gunshot wound to the head, the additional injuries Lee had suffered indicated that the manner of her death was homicide.

## D. The Investigation

Detective John Pringle, who assessed the scene of the crime, surmised that Lee had been living in her cluttered bedroom because the house looked like it had been turned over to Michael and J.B.C. Detective Pringle recovered from Lee's bedroom a .32 Smith and Wesson long caliber revolver, which had been cleaned throughly on the outside, leaving no fingerprints. No blood or tissue was found on the gun. Lee, Michael, Bonsignore and J.B.C.'s hands were all tested for gunshot residue, but each of them came back negative. However, laboratory testing revealed that the gun tended not to deposit particles of significant quantities on the hand of any person who fired it. Detective Pringle also did not find any blood spatter on the ceiling or walls. However, he testified that the Lake Worth Police Department did not have the chemicals necessary to check for blood spatter that was not otherwise visible to the naked eye.

Detective Pringle testified that even before the autopsy he did not believe that Lee's cause of death was a suicide. The scene was odd, and the victim had suffered a single gunshot wound to the head. After the autopsy, however, he was sure Lee's death was a homicide. Detective Pringle further testified that he spoke with Lee's family about suicidal tendencies, and he found nothing suggesting that she was suicidal.

Pastor Frank Briggs, who had known Lee since 1997, testified that there was no way Lee had committed suicide. Similarly, Lee's sister, Colleen Hendrix, did not believe that Lee had committed suicide because Lee believed that a person who committed suicide could not go to heaven. Hendrix also testified as to finding in Lee's house a Big Lots receipt time-stamped less than two hours before her death, a completed driver's license renewal, and a fresh rice casserole on the stove, all of which led to the conclusion that Lee had not committed suicide. However, Dawn C., Lee's daughter and the mother of Michael and J.B.C., initially said that she was neither shocked nor surprised Lee had taken her own life. Dawn later said that she was surprised that a person as deeply religious as Lee would commit suicide.

Additional testimony was elicited from Susan Locke, the daughter of Charles Lee, Lee's late husband. According to Locke, Charles's family was happy that he had married Lee. No one blamed Lee for his heart attack fifteen years earlier nor had any hostility towards Lee regarding ownership of the house. This testimony countered J.B.C.'s theory that Lee killed herself because she felt like she was being blamed for her late husband's death.

As further evidence that Lee's death was not a suicide, the State offered the testimony of Emerick Hernandez, who played basketball with J.B.C. on occasion. Hernandez and his family lived down the street from Lee. Hernandez testified that roughly a week after Lee's death, J.B.C. told him that police were blaming him for Lee's death. J.B.C. confessed to Hernandez that he had put a gun to Lee's head and forced her to write a suicide note before he shot and killed her. Hernandez said that he could smell alcohol on J.B.C.'s breath, and he had no idea why J.B.C. confessed to him that he had killed Lee. J.B.C. denied making his grandmother write a suicide note, and he denied killing her. He testified that Hernandez either misunderstood what he said or he was lying about it. J.B.C. said that he told Hernandez that he and his brother were being accused, but he denied admitting to Hernandez that the allegations were true.

### E. Procedural History

At trial, the State alleged that J.B.C. engaged in delinquent conduct by committing murder. After hearing the evidence, the jury returned a verdict finding that J.B.C. had engaged in the alleged delinquent conduct. After a disposition hearing, the trial court sentenced J.B.C. to forty years' confinement with the Texas Youth Commission, with a possible transfer to the Institutional Division of the Texas Department of Criminal Justice.

J.B.C. brings forth three issues on appeal.

### III. Admission of Photograph

In his first issue, J.B.C. claims that the trial court erred and abused its discretion by admitting Petitioner's Exhibit 55 over objection that the probative value of the photograph was substantially outweighed by the danger of unfair prejudice. In sum, J.B.C. argues that an autopsy photo of Lee's scalp pulled back, which exposed extensive hemorrhaging under her skull, was "unnecessarily graphic and disturbing ... and ... not necessary to establish any element." We disagree.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. Tex.R. Evid. 403. The admissibility of photographs over a challenge is within the sound discretion of the trial court. *Moreno Denoso v. State,* 156 S.W.3d 166, 177 (Tex.App.-Corpus Christi 2005, pet. ref'd); *see Rojas v. State,* 986 S.W.2d 241, 249 (Tex.Crim.App.1998); *Montgomery v. State,* 810 S.W.2d 372, 378–80 (Tex.Crim.App.1990). The trial court's decision will be reversed only if it was "outside the zone of reasonable disagreement." *Moreno Denoso,* 156 S.W.3d at 177 (quoting *Narvaiz v. State,* 840 S.W.2d 415, 429 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993)).

A court may consider the following factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice: (1) the number of exhibits offered, (2) their gruesomeness, (3) their detail, (4) their size, (5) whether they are

offered in color or in black and white, (6) whether they are close-up, and (7) whether the body depicted is clothed or naked. *Sosa v. State,* 230 S.W.3d 192, 195 (Tex. App.-Houston [14th Dist.], 2005, pet. ref'd); *see Rojas,* 986 S.W.2d at 249. Autopsy photographs are generally admissible unless they depict mutilation caused by the autopsy itself. *Frank v. State,* 183 S.W.3d 63, 77 (Tex.App.-Fort Worth 2005, pet ref'd); *see Rojas,* 986 S.W.2d at 249. However, photographs that depict the nature, location, and extent of a wound have been declared probative enough to outweigh any prejudicial effect. *Frank,* 183 S.W.3d at 78; *see Legate v. State,* 52 S.W.3d 797, 807 (Tex.App.-San Antonio 2001, pet. ref'd). Changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant. *Santellan v. State,* 939 S.W.2d 155, 173 (Tex.Crim.App. 1997) (holding autopsy photographs depicting swabs in and a red stain around the victim's mouth admissible).

Here, J.B.C. complains of the admission of an autopsy photo depicting Lee's scalp. Admitted as Petitioner's Exhibit 55 during the testimony of medical examiner Dr. Sisler, the eight-by-ten-inch color photograph was offered and admitted to refute J.B.C.'s suicide defense and show that additional wounds were inflicted prior to death. The photograph depicted extensive hemorrhaging underneath Lee's skin on her skull. Dr. Sisler testified that the photograph fairly and accurately depicted the injuries to Lee's scalp. He further testified that the injuries were not otherwise visible before pulling back the scalp.

The photograph did not depict mutilation caused by the autopsy, but the nature, location, and extent of the wounds as testified to by Dr. Sisler. *See Frank,* 183 S.W.3d at 79. An application of considera-

ble force would have been necessary to fracture Lee's suture line and cause such extensive hemorrhaging. The photograph depicted the full extent of Lee's wounds and was important in determining the manner of death because the wounds were separate from the gunshot wound, which was the cause of death. The pulling back of the skin did not render the evidence significantly more gruesome than the facts of the crime itself because the photograph was the only way to reveal to the jury the full extent of Lee's injuries. *See, e.g., Hayes v. State,* 85 S.W.3d 809, 816 (Tex. Crim.App.2002). Furthermore, because there was only one photograph of the hemorrhage and it reflected the manner of Lee's death and J.B.C.'s state of mind, it was relevant and more probative than prejudicial. *See Laca v. State,* 893 S.W.2d 171, 180 (Tex.App.-El Paso 1995, pet. ref'd) (holding photographs showing part of deceased's body, pool of blood, and instruments of death were admissible). In sum, no less-gruesome evidence was available to demonstrate to the jury the nature, location, and extent of the injures inflicted upon Lee's skull and visible only underneath her scalp.

Therefore, we hold that the probative value of the photograph was not substantially outweighed by its prejudicial effect. *See* Tex.R. Evid. 403. Accordingly, the trial court did not abuse its discretion by admitting Petitioner's Exhibit 55. *See Frank,* 183 S.W.3d at 78. We overrule J.B.C's first issue.

## IV. Jury Argument

■ In his second issue, J.B.C. claims that the State made an improper jury argument during final argument. J.B.C. argues that the trial court erred and abused its discretion by failing to grant a mistrial after sustaining his objections and ruling

the argument improper. Again, we disagree.

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to argument of opposing counsel, or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992), *cert. denied*, 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Crim.App.1973). When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court abused its discretion in denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim.App.2004). Only in extreme circumstances, when the prejudice caused by the improper argument is incurable, i.e., "so prejudicial that expenditure of further time and expense would be wasteful and futile," will a mistrial be required. *Id.; see also Simpson v. State*, 119 S.W.3d 262, 272 (Tex.Crim.App.2003), *cert. denied*, 542 U.S. 905, 124 S.Ct. 2837, 159 L.Ed.2d 270 (2004). In determining whether the trial court abused its discretion in denying the mistrial, we balance three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction absent the misconduct. *Hawkins*, 135 S.W.3d at 77; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim. App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

Here, J.B.C. argues that the State engaged in improper jury argument by making a personal remark to J.B.C. and by giving a personal opinion about the evidence. The comments made by the State included "we're so glad that that pot plant was so important to you," and "we have the best darn circumstantial case that I've ever seen." Both remarks were improper and were objected to by J.B.C., whose objections were sustained by the trial court.

The State presented a breadth of circumstantial evidence that a reasonable jury could and did find difficult to reconcile with J.B.C.'s suicide defense theory. Evidence elicited and presented through witness testimony during trial revealed that Lee had suffered a defensive wound to her arm, a bruised and swollen eye, lacerations to the back of her head, and multiple skull fractures. She was found face down with her arms tucked under her body and a gunshot wound to the back of her head. Evidence also showed that J.B.C. was a pot smoker and occasional methamphetamine user who disrespected his grandmother and her home. J.B.C. was also the only one of five boys in the house at the time of the shooting who left the living room and went down the hallway where Lee's bedroom was located. Furthermore, Hernandez testified that J.B.C. confessed to having forced Lee to write a suicide note before shooting her in the head. The evidence in support of the jury's verdict was substantial, and nothing indicates that J.B.C.'s adjudication was based on an improper argument rather than this evidence. *See Simpson*, 119 S.W.3d at 272. Any prejudice to J.B.C. was cured by the court's instruction to disregard. *See id.* Furthermore, J.B.C. has failed to demonstrate that the trial court's instruction was insufficient to cure the error.

Therefore, we hold that any prejudice caused by the State's jury argument was not so extreme as to be incurable by the trial court's instruction to disregard. *See Hawkins*, 135 S.W.3d at 77. Accordingly, the trial court did not abuse its discretion by denying J.B.C.'s motion for a mistrial. *See id.* We overrule J.B.C.'s second issue.

## V. Sufficiency of the Evidence

■ In his third issue, J.B.C. contends that the evidence was factually insufficient to support his adjudication. J.B.C. argues that the evidence supporting the delinquent conduct by committing murder finding was so weak and evidence to the contrary so overwhelming that the finding should be set aside and a new trial ordered.

### A. Standard of Review

■ When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim.App.2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex.Crim.App.2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim. App.2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

■ In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id.* We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in the evidence. *Id.* We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim.App.1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id.* at 9.

■ An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

### B. Application

As detailed above, the State presented a substantial amount of evidence against J.B.C. at trial. The State presented evidence that Lee did not exhibit suicidal tendencies, that she had engaged in normal activities prior to being shot, and that her injuries indicated homicide as the manner of death. The circumstantial evidence as well as J.B.C.'s confession to Hernandez supported the state's theory that J.B.C. had forced Lee to write a suicide note before shooting her. Similarly, J.B.C. presented contradictory evidence that Lee had written a "suicide note," that she had exhibited odd behavior when opening the door for J.B.C.'s friends, that there was no gunshot residue on J.B.C.'s hands, and that no one heard a gunshot. Specifically, J.B.C. relied on the lack of physical and forensic evidence linking him to Lee's murder and proffered a suicide theory as the

manner of death. The jury agreed with the State.

We may not simply substitute our judgment for the jury's. *Johnson*, 23 S.W.3d at 12; *Cain*, 958 S.W.2d at 407. Under these facts, the record does not clearly reveal that a different result was appropriate, and therefore we must defer to the jury's determination of the weight to be given contradictory testimonial evidence. *Johnson*, 23 S.W.3d at 8. Resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Id.*

Therefore, we hold that the evidence supporting J.B.C.'s adjudication was not so weak that the jury's determination was clearly wrong and manifestly unjust. Furthermore, we hold that the conflicting evidence did not so greatly outweigh the evidence supporting J.B.C.'s adjudication that the jury's determination was manifestly unjust. *See Watson*, 204 S.W.3d at 416–17; *Johnson*, 23 S.W.3d at 11. Accordingly, we hold the evidence factually sufficient to support J.B.C.'s adjudication for delinquent conduct by committing murder. We overrule J.B.C.'s third issue.

## VI. Conclusion

Having overruled J.B.C.'s three issues, we affirm the trial court's judgment.