

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00444-CV

———————————————

IN THE MATTER OF B.C.

On Appeal from County Court at Law No. 1
Wichita County, Texas
Trial Court No. CCL1-JV2020-0027

Before Sudderth, C.J.; Birdwell and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

### I. Introduction

Appellant B.C. appeals the juvenile court's order waiving its jurisdiction and transferring his case to a criminal district court for prosecution as an adult. In one issue, B.C. argues that the juvenile court abused its discretion in transferring his case because the record does not support its findings that

- the State had proven by a preponderance of the evidence that for reasons beyond the State's control, proceeding in the juvenile court before B.C.'s eighteenth birthday was not practicable and

- the State had used due diligence in attempting to complete the proceedings before B.C.'s eighteenth birthday.

We hold that the record supports the juvenile court's findings and, thus, it did not abuse its discretion in transferring his case to the adult criminal courts. We overrule B.C.'s issue and affirm the juvenile court's order.

### II. Background

In late March 2020, the State filed its original petition alleging that B.C. had engaged in delinquent conduct. At the time, B.C. was sixteen years old.

In December 2021—about twenty-one months after the State had filed its original petition and about four months after B.C. had turned eighteen years old—the juvenile court signed an order waiving its jurisdiction and transferring his case to a district court where he would be prosecuted as an adult. Regarding the delay, the juvenile court found:

2

For reasons beyond [the] control of the State—including but not limited to [B.C.'s] lengthy commitment to the North Texas State Hospital soon after he committed the offense alleged, the effects of COVID-19 on the courts of this County[,] and the facility limitations with regards to jury trials in Wichita County—it was not practicable to proceed in juvenile court before [B.C.'s] 18th birthday. [*See* Tex. Fam. Code Ann. § 54.02(j)(4)(A).] Furthermore, the prosecuting attorney exercised due diligence in an attempt to complete the proceeding before the respondent became 18 years of age. [*See id.* § 51.0412(3).]

With these two findings, B.C. finds fault. In a single issue, he argues that the juvenile court abused its discretion in making the Section 54.02(j)(4)(A) and Section 51.0412(3) findings and, thus, in transferring his case to the adult criminal courts.

### III. Applicable Law

#### A. Juvenile delinquency and juvenile courts

Children are not ordinarily subject to criminal proceedings like adults. *In re S.G.R.*, 496 S.W.3d 235, 238 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When a child engages in behavior that would be considered criminal if committed by an adult, it is called "delinquent conduct." *See* Tex. Fam. Code Ann. § 51.03(a)(1). Juvenile courts have exclusive original jurisdiction over cases involving children ten years old or older and under seventeen years old who have allegedly engaged in delinquent conduct. *Id.* §§ 51.02(2)(A), 51.04(a). A juvenile seventeen years of age or older and under eighteen years of age is also defined as a "child" and subject to the juvenile court's jurisdiction if the juvenile allegedly engaged in or was found to have engaged in delinquent conduct as a result of acts committed before the juvenile's seventeenth

3

birthday. *Id.* § 51.02(2)(B). The Juvenile Justice Code governs delinquency proceedings. *See id.* §§ 51.01–61.107.

**B. Juvenile courts and transfers of jurisdiction to adult courts**

Under certain conditions, a juvenile court may waive its exclusive original jurisdiction and transfer the proceeding to a district court for criminal prosecution. *See id.* § 54.02(a), (j). Transferring a child from juvenile court to criminal court for prosecution as an adult should be regarded as the exception, not the rule. *Ex parte Thomas*, 623 S.W.3d 370, 376 (Tex. Crim. App. 2021). Whenever feasible, children should be protected and rehabilitated rather than subjected to the harshness of the criminal system. *Id.* The State must prove that a transfer is appropriate. *Id.*

**C. Transfer hearings and eighteenth birthdays**

What the State must prove to obtain a transfer depends on whether the juvenile has reached the age of eighteen by the date of the transfer hearing. Section 54.02(a) applies when the juvenile is under eighteen at the time of the transfer hearing, while Section 54.02(j) applies when the juvenile is eighteen or older at the time of the hearing. Tex. Fam. Code Ann. § 54.02(a), (j); *see Morrison v. State*, 503 S.W.3d 724, 727–28 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

**D. Transfer hearings after the juvenile's eighteenth birthday**

Because B.C. was eighteen years old at the time of his transfer hearing, Section 54.02(j) applies. *See* Tex. Fam. Code Ann. § 54.02(j). Although Section 54.02(j) has

4

several elements, B.C. contests the juvenile court's findings as to only one of them, so we limit our discussion to that one element:

> (j) The juvenile court may waive its exclusive original jurisdiction and transfer a person to the appropriate district court . . . for criminal proceedings if:
>
> . . .
>
> (4) [it] finds from a preponderance of the evidence that:
>
> > (A) for a reason beyond the control of the [S]tate it was not practicable to proceed in juvenile court before the [eighteenth] birthday of the person . . . .

*Id.* § 54.02(j)(4)(A).

## E. Jurisdictional implications when the juvenile turns eighteen

Section 51.0412 of the Texas Family Code governs the jurisdictional implications when the State begins proceedings when the juvenile is younger than eighteen years old but fails to complete them before the juvenile's eighteenth birthday. *See id.* § 51.0412. Provided the juvenile court finds "that the prosecuting attorney exercised due diligence in an attempt to complete the proceeding before the [juvenile] became [eighteen] . . . years of age," the juvenile court retains jurisdiction. *Id.* § 51.0412(3); *see In re B.R.H.*, 426 S.W.3d 163, 166–68 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding) (recognizing that Section 51.0412 abrogated *In re N.J.A.*, 997 S.W.2d 554, 556 (Tex. 1999), which held that after the juvenile's eighteenth birthday, the juvenile court's jurisdiction was limited to either transferring the case to an appropriate district court or dismissing the case). Due diligence requires the State

to move ahead or reasonably explain delays, but it does not require the State to do everything conceivable to avoid delay. *In re J.C.W.G.*, 613 S.W.3d 560, 566 (Tex. App.—San Antonio 2020, no pet.).

**F. Standard of review**

When reviewing a discretionary transfer, we evaluate the trial court's factual findings under traditional sufficiency-of-the-evidence principles. *In re J.G.*, 495 S.W.3d 354, 369 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Under a legal-sufficiency analysis, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable factfinder could not reject the evidence. *Id.* at 370. We review the evidence in the light most favorable to the trial court's findings. *J.C.W.G.*, 613 S.W.3d at 569. Unless only one inference can be drawn from the evidence, we do not second-guess the factfinder. *J.G.*, 495 S.W.3d at 370. If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.*

Under a factual-sufficiency challenge, we consider all the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Id.* Unless the record clearly shows that a different result is appropriate, we must give due deference to the factfinder's determinations, particularly if those determinations turn on weight and credibility. *See In re J.B.C.*, 233 S.W.3d 88, 97 (Tex. App.—Fort Worth 2007, pet. denied).

6

If the findings of the juvenile court are supported by legally and factually sufficient proof, then we review the ultimate transfer decision under an abuse-of-discretion standard. *In re H.Y.*, 512 S.W.3d 467, 478–79 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *J.G.*, 495 S.W.3d at 370. As with any decision that lies within the trial court's discretion, the question is not whether we might have decided the issue differently. *H.Y.*, 512 S.W.3d at 479. Instead, we ask whether the juvenile court acted arbitrarily, given the evidence before it, or whether its decision represented a reasonably principled application of the legislative criteria. *Id.*

## IV. Discussion

At both the beginning and the end of the transfer hearing, the juvenile court took judicial notice of its file. Because the juvenile court took judicial notice of its file, it had not only the evidence presented at the hearing—that is, the evidence found in our reporter's record—but it also had the contents of its file—effectively the contents of our clerk's record—with which to work. Between the juvenile court's file and the evidence admitted at the hearing, the record shows the following.

### A. March 2020—State filed its original petition

The State filed on March 25, 2020, a petition alleging delinquent conduct. The State alleged that on or about February 24, 2020, B.C. had intentionally, knowingly, or recklessly caused bodily injury to a public servant by striking the public servant in the face with a closed fist. Born in early August 2003, B.C. was sixteen years old when this offense allegedly occurred. As alleged, if tried as an adult, the offense would be a

7

third-degree felony. *See* Tex. Penal Code Ann. § 22.01(a)(1), (b)(1) (assault on a public servant). The State also alleged that B.C. had three prior adjudications for engaging in violent delinquent conduct.

## B. May 2020—B.C. sent to mental health hospital, and State filed amended petition

On May 5, 2020, B.C. was admitted to the North Texas State Hospital after acting out and making suicidal statements.[1] Two days later, on May 7, 2020, B.C.'s attorney filed a "Motion for Examination and Hearing on Fitness to Stand Trial." Counsel averred that B.C. had neither the "present ability to consult with counsel with a reasonable degree of rational understanding" nor "a rational or factual understanding of the proceedings against him." Counsel asked that "a disinterested expert be appointed in order to obtain an independent opinion of [B.C.'s] mental status."

On May 20, 2020, the State filed its first amended petition alleging delinquent conduct in which, in addition to the previous allegations, it pleaded that B.C. had, on or about April 30, 2020, intentionally and knowingly caused serious bodily injury to a child fourteen years of age or younger by choking or strangling the child. Had an adult committed the alleged offense, it would have been a first-degree felony. *See* Tex. Penal

---

[1]North Texas State Hospital serves "people with mental illness and co-occurring mental illness and intellectual disabilities who have been screened and referred by their local mental health authorities." North Texas State Hospital, https://northtexasstatehospital.com (last visited Apr. 26, 2022). It also serves "forensic psychiatric patients primarily referred for competency restoration." *Id.*

Code Ann. § 22.04(a)(1), (e) (injury to a child). At the time of the alleged offense, B.C. was still sixteen years old.

Additionally, on May 20, 2020, a grand jury certified B.C. for determinate sentencing for both the assault-on-a-public-servant and the injury-to-a-child offenses. *See* Tex. Fam. Code Ann. § 53.035. Absent this certification, the maximum disposition that B.C. could have received in the juvenile court extended only to his nineteenth birthday. *See* Tex. Hum. Res. Code Ann. § 245.151(d). With the certification, B.C. faced a maximum determinate sentence of ten years for the third-degree felony and forty years for the first-degree felony. *See* Tex. Fam. Code Ann. § 54.04(d)(3)(A), (C).

These two new developments—B.C.'s trip to the mental health hospital and B.C.'s committing a new offense—were significant. B.C. now was no longer available for trial, and he had now allegedly committed a far more serious offense. A factfinder could have reasonably concluded that these new developments were beyond the State's control, so both are some evidence supporting the juvenile court's Section 54.02(j)(4)(A) finding. *See J.C.W.G.*, 613 S.W.3d at 569 (requiring appellate courts to view evidence in the light most favorable the trial court's findings when determining legal sufficiency); *J.B.C.*, 233 S.W.3d at 97 (requiring appellate courts to give due deference to the trial court's findings when determining factual sufficiency).

The State filed its amended petition and procured grand-jury certification within one month of when this second alleged offense occurred. A factfinder could reasonably conclude that the State had acted diligently, so both the amended petition

9

and the grand-jury certification are some evidence supporting the juvenile court's Section 51.0412(3) finding. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

## C. June to September 2020—B.C. evaluated on whether he was fit to proceed

On June 23, 2020, the juvenile court appointed Dr. Stacey Shipley to examine B.C. to determine whether he was fit to stand trial. And on September 20, 2020, Dr. Shipley issued an evaluation in which she found that B.C. was fit to proceed. A factfinder could have reasonably concluded that the time it took to determine whether B.C. was fit to proceed was beyond the State's control, so here again is some evidence supporting the juvenile court's Section 54.02(j)(4)(A) finding. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

## D. September 2020 to March 2021—B.C. remained in mental health hospital

Yet due to his self-harming behavior, B.C. remained in the hospital until March 3, 2021, when he was discharged. Juvenile probation officer Tyler Tackett testified that he thought that B.C. wanted to remain at the mental health hospital to avoid having to stay at the detention facility. In all, B.C. spent about ten months in a mental health hospital. B.C. is not arguing that the State should have tried him in absentia, and nothing in the record suggests that the State had any control over when the mental health hospital released B.C. A factfinder could have reasonably concluded that the time that B.C. spent in the mental health hospital was beyond the State's control, so this evidence supports the juvenile court's Section 54.02(j)(4)(A) finding. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

Once back in juvenile detention on March 3, 2021, however, B.C. began self-harming and screaming that he wanted to kill himself. Detention personnel called American Medical Response, the Wichita Falls Fire Department, and the Wichita County Sherriff's Office to assist in transporting B.C. back to the mental health hospital for a suicidal evaluation, but the hospital denied admission. B.C. was transported back to juvenile detention on March 4, 2021. This evidence supports the reasonable inference that B.C. remained in the mental health hospital as long as he did based on his behavior. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97. Another reasonable inference is that at some point the hospital concluded that B.C.'s behavior was more manipulative than substantive. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

**E. April 2021—B.C. requested jury trial**

Shortly after returning to juvenile detention, on April 13, 2021, B.C. requested a jury trial. Tackett explained that due to the COVID-19 pandemic, the juvenile court was not conducting any jury trials. Until such time as the COVID-19 restrictions were removed, the State was not able to proceed.

A factfinder could have reasonably concluded that any delay caused by B.C.'s request for a jury trial and the pandemic that made jury trials impossible was beyond the State's control and that the failure to proceed was not due to any lack of due diligence by the State, so this evidence supports the juvenile court's Section

11

54.02(j)(4)(A) and Section 51.0412(3) findings. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

**F. May 2021—B.C. released from detention**

The juvenile court signed an order on May 3, 2021, releasing B.C. from detention with conditions. This allowed B.C. to wait for his jury trial from his mother's home.

**G. June 2021—B.C. withdrew request for jury trial, and bench trial set for August**

B.C. withdrew his request for a jury trial on June 28, 2021. Two days later, on June 30, 2021, the juvenile court set the case for a bench trial on August 18, 2021. August 18 was, however, after B.C.'s eighteenth birthday.

The trial date was set promptly after B.C. withdrew his request for a jury trial. Nothing here suggests an absence of due diligence. The trial date itself was a function of the court's docket, something over which the State had no control. Both support the juvenile court's Section 54.02(j)(4)(A) and Section 51.0412(3) findings. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

**H. July 2021—State filed petition for discretionary transfer**

About three weeks after the juvenile court set B.C.'s case for trial, on July 19, 2021, the State filed a petition for discretionary transfer. July 19 was less than a month before B.C.'s eighteenth birthday. Filed before B.C.'s eighteenth birthday, the State relied exclusively on Section 54.02(a) of the Texas Family Code. *See* Tex. Fam. Code

Ann. § 54.02(a). As discussed below, the State argued that Section 54.02(a) applied regardless of whether the transfer hearing itself occurred after B.C.'s eighteenth birthday.

B.C. argues that the sixteen months between the filing of the original petition alleging delinquent conduct and the filing of the petition to transfer was untenable. *See J.G.*, 495 S.W.3d at 359, 370 (noting four months between original petition and motion to transfer); *B.R.H.*, 426 S.W.3d at 165–66, 168 (noting (1) the five-month delay between the date that the State received the offense report and the date that the State charged the juvenile and (2) the two-month delay between the date that the State filed its original petition and the date of the first hearing). We disagree.

B.C. cites no statute dictating that the State must file a petition to transfer by a date certain. B.C. attributes the delay to a lack of due diligence, but the delay also could have been attributed to an intention to keep B.C.'s case in the juvenile court—at least until a certain point. When it became apparent that B.C. could not be tried in the juvenile court until after his eighteenth birthday, the State apparently reevaluated how to proceed and decided to seek a transfer. In short, the timing of the State's petition to transfer lent itself to multiple inferences. *See J.G.*, 495 S.W.3d at 370. Thus, the timing of the State's petition to transfer—about three weeks after it was finally able to procure a trial setting—could be reasonably viewed as due diligence or, at the very least, could be reasonably viewed as not showing a lack of due diligence. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

**I. July 2021 to November 2021—Diagnostic study prepared**

After the State filed its petition to transfer on July 19, 2021, B.C. filed on July 21, 2021, an "Opposition to Petition for Discretionary Transfer" and a "Motion for Continuance" in which he requested an independent examination as required by the Texas Family Code and a trial continuance so that the required diagnostic report could be prepared. *See* Tex. Fam. Code Ann. § 54.02(d). The juvenile court, however, had already ordered the diagnostic study on July 19, 2021. And on July 22, 2021, the juvenile court signed an order (1) appointing Dr. Shipley to conduct the study and complete it by September 15, 2021, and (2) granting a "continuance of the bench trial set for August 18, 2021, pending the receipt of the diagnostic report[] and [a] hearing on the matter of Discretionary Transfer."

Preparing the diagnostic study took longer than anticipated. Dr. Shipley filed a 53-page, single-spaced diagnostic study on November 16, 2021. Regarding the delay, Dr. Shipley stated,

> Being mindful of the court's time, I will just say that in addition to the great deal of records and the breadth of the evaluation, I think in September there were two trials -- I believe they were all September -- that I testified in, one I was on standby and had prepared for. I also had to return to Iowa with my mom to help her empty a house that she needed to get herself out of to be sold, and I had an aunt and a grandmother pass away within that same month as well. And due to COVID concerns, we went back 30 days later for my aunt's services. And I also had a prior commitment at a forensic conference to do two separate presentations that last week in October that I had committed to in the summer.

14

A factfinder could reasonably conclude that the delay occasioned by the diagnostic study was beyond the State's control, which would support the juvenile court's Section 54.02(j)(4)(A) finding. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

**J. November 2021—B.C. absconded; B.C. detained**

While Dr. Shipley was still working on the diagnostic study, on November 8, 2021, the juvenile court signed a "Directive to Apprehend and Detain" authorizing law enforcement to detain B.C. and remand "said juvenile to a suitable detention facility." The supporting affidavit indicated that B.C. had removed his electronic leg monitor and that B.C.'s whereabouts were unknown. Within a few hours, B.C.'s brother located him. But B.C. cut his wrists when the police arrived, so he was transported to a hospital. Although the extent of B.C.'s injuries is not clear, a reasonable inference is that they could not have been that severe because two days later, at the November 10, 2021 detention hearing, the juvenile court ordered B.C. to remain in the juvenile detention facility. A reasonable inference is that B.C. wanted to avoid the transfer hearing. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

**K. December 2021—Transfer hearing**

**1. Exhaustion of juvenile services**

The hearing on the State's petition for discretionary transfer occurred on December 17, 2021—about four months after B.C.'s eighteenth birthday. Tackett testified that the juvenile department had "offered everything we could throw at him

15

that he qualifies for and at this time there's nothing left that we can offer him in the community."

**2. State stymied**

Tackett acknowledged that while B.C. was at the mental hospital, B.C. technically remained in the probation department's custody. He also acknowledged that while B.C. was in the hospital, at no point was B.C. not fit for trial. Despite being in the probation department's custody and despite B.C.'s being fit for trial, Tackett explained that he had not heard of any instance when a self-harming juvenile would be brought from the hospital to juvenile court to stand trial.[2]

Finally, Tackett explained the significance of B.C.'s requesting a jury trial once he returned from the hospital. During the pandemic, the juvenile court had no jury trials.

**3. Confusion over which transfer provision applied**

At the close of the hearing, the State argued that Section 54.02(a), not Section 54.02(j), applied because it had filed its petition to transfer before B.C.'s eighteenth birthday. The juvenile court, however, opted to apply Section 54.02(j). The State did not dispute that Section 51.0412—the jurisdictional provision—applied.

---

[2]Although B.C. expressed suicidal ideation when he was returned to the juvenile detention facility in March 2021, and although B.C. cut his wrists when apprehended by the police in November 2021, these incidents were ostensibly treated as attempts to manipulate. *See J.C.W.G.*, 613 S.W.3d at 569; *J.B.C.*, 233 S.W.3d at 97.

B.C. argues that because the State thought that it was proceeding under Section 54.02(a), it failed to prove up Section 54.02(j)(4)(A)—that it was not practicable to proceed in juvenile court before his eighteenth birthday for reasons beyond the State's control—and, in the process, also failed to prove up the State's due diligence under Section 51.0412(3). We disagree.

The record shows that the State was aware that Section 51.0412 applied and, inferentially, that it had to prove due diligence. Both Section 51.0412(3) and Section 54.02(j)(4)(A) are concerned with delays and their explanations, so evidence to support one frequently supports the other. And the record shows that the juvenile court was aware that Section 54.02(j) applied, so—regardless of what the State believed—the juvenile court focused on whether the State had proven that, for reasons beyond the State's control, proceeding in juvenile court before B.C.'s eighteenth birthday was not practicable. As discussed above, evidence supports the juvenile court's Section 51.0412(3) and Section 54.02(j)(4)(A) findings.

**L. Ruling**

We hold that more than a scintilla of evidence supports the juvenile court's findings that for reasons beyond the control of the State, it was not practicable to proceed in the juvenile court before B.C.'s eighteenth birthday and that the State used due diligence, and we hold that those findings are not so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *See J.G.*, 495 S.W.3d at 369–70. Because B.C. contested only these two findings, and because we find the

17

evidence both legally and factually sufficient to support them, we further hold that the juvenile court's decision to waive its jurisdiction and transfer B.C.'s proceedings to a district court was both reasonable and principled and, thus, did not constitute an abuse of discretion. *See H.Y.*, 512 S.W.3d at 478–79; *J.G.*, 495 S.W.3d at 370. We overrule B.C.'s sole issue.

## V. Conclusion

Having overruled B.C. sole issue, we affirm the juvenile court's order.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  May 5, 2022