**Affirmed and Memorandum Opinion filed August 27, 2024.**



In The

# Fourteenth Court of Appeals

## NO. 14-23-00362-CR

**STUART SIMONTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court
Harris County, Texas
Trial Court Cause No. 1647461**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Stuart Simonton guilty of first-degree murder and assessed punishment at 38 years' confinement. Appellant appeals and, in four issues, challenges certain evidentiary rulings and the trial court's failure to grant a mistrial following the State's closing argument. For the reasons below, we affirm.

### BACKGROUND

Appellant was arrested the evening of April 3, 2019, and charged with first-

degree murder of his downstairs neighbor, Complainant. He proceeded to a jury trial in May 2023. The jury heard from seventeen witnesses; we summarize relevant portions of their testimonies below.

*Anjanette Delgado*

Anjanette Delgado is Complainant's niece. According to Delgado, she, her husband, and their two children arrived at Complainant's apartment building at approximately 6:30 p.m. on the day of the incident for a barbecue. According to Delgado, no one else was present at the gathering aside from her family and Complainant.

Delgado testified that their barbecue was "constant[ly]" interrupted by Appellant, Complainant's upstairs neighbor. Delgado said Appellant would "shout" at them to "be quiet" and accused them of "trying to burn his apartment down." Delgado said Complainant told everyone to "just . . . ignore him."

According to Delgado, the Houston Fire Department arrived shortly thereafter responding to a fire reported by Appellant. Delgado said her family pointed out to the responding firefighters that the only fire was in the fire pit. Delgado said Appellant walked downstairs to talk to the firefighters and, during this time, told Delgado's husband "I'll beat your ass" and "got in [Delgado's] face." Delgado said Houston police officers arrived at the apartment building after the firefighters left.

After the police officers left, Delgado said everyone in their group "continued to sit there and have a good time on the picnic table." Delgado testified that she, her husband, and their children left at approximately 10:00 p.m.

*Sergio Lopez*

Sergio Lopez is a firefighter with the Houston Fire Department and

2

responded to Appellant's report of a fire the evening of April 3rd. During their response, Lopez said the firefighters found "a woman out there barbecuing with her family" and "no fire" but rather "a barbecue pit that was smoking." According to Lopez, the incident was called in as a "false alarm" and there was no danger from the barbecue pit "potentially catching the house on fire."

Lopez recalled that, while the firefighters were there, a man stuck his head out of an upstairs window to argue with the people outside the apartment building. Lopez said the firefighters "call[ed] the police out because it turned into basically like a domestic dispute." Lopez testified that the firefighters left when the police officers arrived.

According to Lopez, the fire department again was called out approximately two hours later to respond to reports of a stabbing. Lopez said he found Complainant "laying on the ground with several stab marks, not breathing, not conscious, unresponsive." Lopez recalled that Complainant had three stab wounds: two in her chest and one in her back. Lopez said Complainant was loaded into an ambulance and transported to the hospital.

### *Officer Hernandez*

Officer Hernandez is one of the police officers who responded to the domestic violence incident reported at Complainant and Appellant's apartment building the evening of April 3rd. Recalling her conversation with the firefighters, Officer Hernandez stated that they had no concerns about a fire because "it was just a fire pit where . . . they were barbecuing." Summarizing her thoughts on the incident, Officer Hernandez said that her "impression was there was people just trying to barbecue and there was some type of disagreement about some smoke that might have been coming from the fire pit." Officer Hernandez testified that "the neighbors were both upset at each other."

Officer Hernandez said Appellant came downstairs from his apartment unit to speak to the responding officers. According to Officer Hernandez, Appellant "seemed belligerent" and "upset," and kept stating that he "was the enforcer." Officer Hernandez said she "asked [Appellant] if he had a weapon just because he seemed that upset." Describing Appellant as "unreasonable," Officer Hernandez said he repeatedly stated he "wanted them out and that he wanted to make that decision, but I kept telling him, again, he wasn't the property owner." Officer Hernandez felt that Appellant "was upset that we weren't — he felt like we weren't siding with him because no one was going to jail."

Officer Hernandez recalled the following exchange with Appellant:

And [Appellant's] like, "Oh, well, tomorrow things are going to change. As of tomorrow things are going to change." I remember saying — I remember him saying that. And that's when I said, "Sir, you might want to watch the way you say things because someone might perceive that as a threat, like you're threatening that you're going to do something tomorrow."

According to Officer Hernandez, she called the district attorney's office and "explained to them that it was — it was a disturbance between two neighbors who had conflicting statements in regard to what each other were saying and threats that were — had been made by each other." Officer Hernandez said the decision was made to deny pressing charges stemming from the incident. Officer Hernandez said the officers completed their report and left the scene at approximately 10:00 p.m.

### *Gustavo Saucedo*

Gustavo Saucedo lived in the apartment building next to the building occupied by Complainant and Appellant. Describing the day of the incident, Saucedo said he was inside his apartment unit when he saw firefighters and police

4

officers arrive at the barbecue. After the firefighters and police officers left, Saucedo said he went over to visit Appellant in Appellant's apartment. Saucedo said he and Appellant were "friendly" and occasionally hung out together.

Saucedo recalled that he and Appellant drank alcohol and played video games that evening. During their visit, Saucedo used his phone to surreptitiously record his conversation with Appellant. Saucedo said he recorded the conversation because he was concerned about Appellant's "body language" and wanted to record "for [his] safety just in case something happened between [him] and [Appellant]."

The video recording was admitted into evidence. According to Saucedo, he and Appellant were discussing growing marijuana plants when they had the following exchange:

> Appellant: Let me ask you a question. Should I kill 'em? Should I let her make it?
>
> Saucedo: What, the plant?
>
> Appellant: No, not the plant, her. Should I let her make it? Or should I have her fucking institutionalized? 'cause I can do that quick.
>
> Saucedo: That's you.
>
> Appellant: Trust me, I'm an asshole bro. I don't give a fuck.

The video recording does not show the men as they are talking and shows only the bottom of Appellant's legs.

Discussing the recording, Saucedo said that, as Appellant "was asking about killing something," Appellant "pointed down." Saucedo interpreted this gesture to mean that Appellant was referencing Complainant, who lived downstairs.

5

Saucedo said he left Appellant's apartment shortly thereafter and, as he walked out the door, saw Complainant sitting on a chair on the balcony. Saucedo recalled that Complainant was drinking alcohol and "appeared to be intoxicated." Saucedo said he was not surprised to see Complainant sitting there because he previously had seen her sitting on the balcony. According to Saucedo, "whenever [Complainant's] up there by herself, she's always happy." Saucedo testified that he had no difficulty recognizing that the person on the balcony was Complainant.

Saucedo said he had returned to his apartment unit when, approximately ten minutes later, Complainant came screaming to his door saying that Appellant "had stabbed her." When he walked out the door, Complainant was laying on the floor. Saucedo said he called 911 and stayed with Complainant until the ambulance arrived.

### Trinity Juneau

Trinity Juneau is the sister of Saucedo's wife. On April 3rd, Juneau was living with Saucedo and his wife in the apartment building next door to the building occupied by Complainant and Appellant. Juneau was fifteen years old.

Juneau recalled the fire department arriving at the barbecue in response to Appellant's call. According to Juneau, Appellant "was upset about the family being over there and they were having a fire too close to the building and just upset about the noise and everything." Juneau said she left to church shortly thereafter and arrived back at the apartment buildings by 9:00 p.m.

That same evening, Juneau went with Saucedo to hang out in Appellant's apartment. Juneau said she left at approximately 10:30 p.m., walked downstairs, and saw Complainant cleaning up after the barbecue. Juneau returned to her room, which was located across from Appellant's apartment unit.

6

When she was in her room, Juneau recalled hearing Appellant say, "'What are you doing,' or, 'Bitch, what are you doing,' something of that matter." Juneau "looked through the peephole in [her] door" and saw Complainant sitting on a balcony chair outside Appellant's apartment door. Juneau testified that she saw Appellant "run inside" and then "run back outside and hit [Complainant] twice." Juneau thought that Appellant "just punched" Complainant. Juneau did not see anything in Appellant's hands and thought he and Complainant "were both drunk, just kind of fighting."

Juneau said Complainant was sitting in the balcony chair during the entirety of her encounter with Appellant. According to Juneau, apartment "residents would come up there, just sit, and look over at the bar across the street." Juneau said it was not unusual to see Complainant up there because, "when [Complainant] would be drinking, she liked to look at the stars and look at the sky."

Shortly after witnessing the incident on the balcony, Juneau said Complainant started screaming for her and Saucedo while yelling, "[h]e stuck me, he stuck me, he stuck me." Juneau exited the apartment unit and saw Complainant on the ground and Saucedo calling 911.

According to Juneau, she spoke to investigators a couple of days later but did not tell them what she saw through the peephole in her apartment door. Juneau said she "was just scared" and "didn't want to come do this." Juneau said she relayed what she witnessed approximately three years later because "it was just time to get it over with."

**Officer Perez**

Officer Perez is one of the police officers that responded to reports of a stabbing at Complainant and Appellant's apartment building on April 3rd. Officer

7

Perez recalled arriving at the scene and seeing a "deceased" Complainant. Officer Perez proceeded to place Appellant in handcuffs. Officer Perez said that Appellant was "compliant" and "voluntarily" talked to him.

While he was detained, Officer Perez recalled Appellant saying he "grabbed the knife from [Complainant] and stabbed her" in "self-defense." Appellant told Officer Perez that the incident took place on the balcony area immediately outside his second-floor apartment unit. Officer Perez remembered seeing blood on the staircase near Appellant's apartment unit.

### Detective Jimenez

Detective Jimenez met with Appellant after Appellant was transported to the police station. Describing his first meeting with Appellant, Detective Jimenez said Appellant "seemed okay" and was "not really distraught." However, once Appellant was told that Complainant died, Appellant "got pretty distraught, started crying, and pounding his hand on the [] floor, dropped to his knees, that kind of thing." Detective Jimenez said, at one point, Appellant expressed that he just "wanted [Detective Jimenez] to shoot him."

According to Detective Jimenez, Appellant gave "one of the versions" of what happened and stated that he stabbed Complainant after she "attacked" him and "came at him with a knife." Detective Jimenez said Appellant asserted he "never meant to hurt her" and that "she scared him, she wasn't supposed to be up there." When asked why Complainant was on the balcony outside his apartment, Appellant stated that he "guessed that she was trying to talk to him" and was "trying to make amends." Appellant recalled that Complainant was sitting in a chair near his front door at the time of the incident.

Detective Jimenez said Appellant provided a different "version" of events

shortly thereafter. Appellant told Detective Jimenez that a "crackhead" previously had come to his apartment and pointed a gun in his face. Appellant told Detective Jimenez "he thought [Complainant] was that crackhead" and "tr[ied] to stab her in the arm to disarm her." Appellant also told Detective Jimenez he "ha[d] a steak knife in his hand and then he happened upon [Complainant] sitting on a chair and he gave her a little stab." Appellant gave several different reasons for why he had a knife: eating steak, cutting cheese, and opening cat food. Detective Jimenez pointed out that, earlier in their interview, Appellant said he took the knife from Complainant.

Appellant told Detective Jimenez he stabbed Complainant only once. However, according to Detective Jimenez, Complainant had "at least two punctures and several other possible defensive wounds." Photographs of Appellant were admitted during Detective Jimenez's testimony; these photographs showed that Appellant had red scratches on his arms.

Detective Jimenez said the entire interview lasted for approximately six hours. Summarizing Appellant's statements regarding the incident, Detective Jimenez said it appeared that Appellant offered multiple versions of the events that occurred. According to Detective Jimenez, Appellant appeared to be "changing his story" and "looking for details to alter to explain away." Detective Jimenez did not think Appellant was intoxicated and said he "talked very clear."

According to Detective Jimenez, a search warrant was issued for Appellant's apartment and a video surveillance system was recovered. Detective Jimenez said he and Appellant reviewed the footage for several days preceding the incident but they were unable to find the "crackhead incident" that, according to Appellant, had "happened several days before." Detective Jimenez also said there was no video footage from the day that Complainant was stabbed. Detective Jimenez recalled

that Appellant seemed "surprised when there was no footage on the day of this murder."

### Dr. Maclayton

Dr. Maclayton is an assistant medical examiner at the Harris County Institute of Forensic Sciences. Dr. Maclayton reviewed the autopsy performed on Complainant the day after her death.

Dr. Maclayton identified "multiple sharp force injuries" on Complainant, including two stab wounds to the chest, one stab wound to the back, and a sharp force injury on Complainant's left hand. Dr. Maclayton opined that the injury to Complainant's hand was "consistent with other defensive wounds" she had seen in her practice.

Discussing the wound to the left side of Complainant's chest, Dr. Maclayton said the knife entered the upper lobe of Complainant's lung and pierced the side of her heart. Dr. Maclayton opined that either of these injuries could have caused Complainant's death through uncontrolled bleeding into the chest cavity. During this testimony, a photograph was admitted showing a medical container filled with blood collected from Complainant's chest cavity.

On cross-examination, Dr. Maclayton reviewed the toxicology report completed during Complainant's autopsy. The toxicology report showed that Complainant's alcohol levels were 0.124 grams per 100 milliliters and 0.146 grams per 100 milliliters for blood collected from her femoral artery and vitreous humor, respectively.

### Rebecca Gonzales

Rebecca Gonzales works at the Houston Forensic Science Center and reviewed the DNA evidence obtained in this case. Gonzales said she performed

DNA analyses on three knives recovered from the scene where Complainant was stabbed. Gonzales opined that, "if two people are struggling over an item of evidence," it is likely "that the DNA would be on the item."

According to Gonzales, one knife recovered from the scene did not have enough human DNA detected on it as necessary to move forward with the comparison process. Gonzales testified that the second knife recovered from the scene had human DNA on it and "both [Complainant and Appellant] were excluded as possible contributors to the mixture."

Finally, with respect to the third knife, Gonzales testified that the DNA provided "very strong support that [Complainant] and [Appellant] are contributors to the DNA from this item." Gonzales said DNA testing also was done on a swab taken from a stain on the knife that was believed to be blood. Gonzales testified that the analysis provided support for the conclusion that Complainant was a donor to the DNA mixture in the bloodstain and that Appellant was not a DNA contributor.

### William Faison

William Faison lived at the same apartment complex as Complainant and Appellant and resided there at the time of stabbing. Faison said he and Complainant were "causal acquaintances" and occasionally would barbecue together.

When asked about the relationship between Complainant and Appellant, Faison testified that "[t]hey didn't like each other." Although Faison said he got along with both Complainant and Appellant, he also said he would not invite them to the same social event because he "understood that they didn't get along."

11

*Conclusion of Trial*

After the parties rested, the jury retired to deliberate and returned a verdict finding Appellant guilty of murder. *See* Tex. Penal Code Ann. § 19.02. The jury assessed punishment at 38 years' confinement and a $10,000 fine.[1] *See id*. § 19.32. Appellant timely appealed.

## ANALYSIS

Appellant raises four issues on appeal and asserts:

1. the trial court erred in failing to grant a mistrial "due to the prosecutor's inflammatory and impermissible closing argument";

2. the trial court erred in admitting Saucedo's video recording of his conversation with Appellant;

3. the trial court erred in excluding Appellant's medical records from the evidence; and

4. the trial court erred in admitting into evidence a photograph of the blood drained from Complainant's chest cavity.

We consider these issues individually.

## I.     The State's Closing Argument

During his closing argument, the State's prosecuting attorney told the jury:

Now we also have the "she was drunk" defense. I don't think

---

[1] We note that the $10,000 fine was not orally pronounced by the trial court as part of Appellant's sentence. However, the fine was assessed as part of the jury's verdict and included in the written judgment.

As a general rule, when the oral pronouncement of a sentence and the written judgment vary, the oral pronouncement controls. *See Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004); *Lopez v. State*, 515 S.W.3d 547, 549 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). However, because "[t]he jury's verdict imposed a lawful fine within the permissible statutory range, and its verdict was read aloud in court in [Appellant's] presence," the $10,000 fine may be properly imposed despite the trial judge's failure to orally pronounce it. *Ette v. State*, 559 S.W.3d 511, 515-17 (Tex. Crim. App. 2018).

12

> [defense counsel] really explained why [Complainant] was drunk is a defense, but he put it out there. The only conclusion I can come to is if somebody is drunk, she must have deserved it.

Defense counsel objected on grounds of improper argument and the trial court sustained the objection. The trial court instructed the jury "to disregard any comments about the defense attorney concluding that the Complainant deserved to be killed because she was drunk." Defense counsel also moved for a mistrial, which the trial court denied. On appeal, Appellant contends it was error for the trial court to overrule his request for a mistrial on this basis.

We review the trial court's denial of a motion for mistrial under an abuse of discretion standard. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Under this standard, we view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it falls within the zone of reasonable disagreement. *Id*. A mistrial is a remedy intended for extreme circumstances when prejudice is incurable and less drastic alternatives have been explored. *See id*.

To evaluate whether the trial court abused its discretion by denying Appellant's motion for mistrial in this context, we balance the three "*Mosley*" factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011) (citing *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) (en banc)); *see also, e.g.*, *Bigbie v. State*, No. 14-19-00504-CR, 2021 WL 2586346, at *6 (Tex. App.—Houston [14th Dist.] June 24, 2021, pet. ref'd) (mem. op., not designated for publication). Mistrial is the appropriate remedy when the objectionable events are

so emotionally inflammatory that curative instructions are unlikely to prevent the jury from being unfairly prejudiced against the defendant. *Archie*, 340 S.W.3d at 739.

## A.   Severity of the Misconduct

Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) a reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007). We presume without deciding that the State's allusion to defense counsel's reasons for bringing up Complainant's intoxication falls outside these categories. However, considered in light of the record as a whole, these statements do not constitute the type of severe misconduct that warrants a mistrial. *See Archie*, 340 S.W.3d at 739.

The record contains evidence showing that Complainant had consumed alcohol shortly before her death. Reviewing Complainant's toxicology report, Dr. Maclayton testified that Complainant's alcohol levels were as follows: 0.124 grams per 100 milliliters for blood tested from Complainant's femoral artery, and 0.146 grams per 100 milliliters for blood tested from Complainant's vitreous humor.[2]  Saucedo also testified that, when he exited Appellant's apartment the evening of April 3rd, Complainant was drinking alcohol and "appeared to be intoxicated."

But aside from these references, there is no evidence in the record showing an interaction between Appellant and Complainant immediately before the stabbing that was compounded by her consumption of alcohol. Rather, the

---

[2] Under the Texas Penal Code, "intoxicated" is defined as a blood alcohol concentration of 0.08 or more per 100 milliliters of blood. *See* Tex. Penal Code Ann. § 49.01(1)(B), (2)(B).

14

evidence showed only that Complainant was sitting on a balcony chair outside Appellant's door — something she had done previously. According to both Saucedo and Juneau, Complainant would regularly spend time on the balcony outside Appellant's apartment unit; Saucedo testified that Complainant was "always happy" when she did so. In sum, given the lack of evidence showing that Complainant's alcohol consumption directly exacerbated the situation between her and Appellant, any prejudicial effect stemming from the State's insinuation that defense counsel used Complainant's intoxication to justify her death is limited.

Moreover, the record shows that the tension between Appellant and Complainant had been building for hours before it culminated in her death. Appellant called the fire department to report a fire; when the fire department arrived, they called the police to report a "domestic dispute" that appeared to be ongoing between Complainant and Appellant. Describing the situation, Officer Hernandez said "the neighbors were both upset at each other" and that Appellant wanted Complainant off the property. These sentiments were reiterated in Saucedo's recorded conversation between him and Appellant and suggested a contentious relationship that preceded Complainant's alcohol intake the day she was killed.

Considering the evidence introduced at trial, the State's statement during closing argument was at worst flippant, but the statement does not constitute severe misconduct. This factor suggests that the trial court did not abuse its discretion in overruling Appellant's motion for mistrial. *See id.*

## B. Measures Adopted to Cure the Misconduct

Here, the trial court promptly sustained Appellant's objection to the challenged statements and instructed the jury "to disregard any comments about the defense attorney concluding that the Complainant deserved to be killed because

15

she was drunk."

Generally, an instruction to disregard will cure harm stemming from improper jury argument unless the comments are "so indelible that the jury would simply ignore the trial court's specific and timely instruction to disregard them." *Id*. at 741. For the reasons we discussed above, we conclude the challenged statements were not "so indelible" that they would remain fixed in the jurors' minds despite the trial court's instruction to disregard. Therefore, this factor counsels against concluding that the trial court erred in failing to grant Appellant's motion for mistrial. *See id*. at 739.

## C.    Certainty of the Conviction Absent the Misconduct

Finally, absent the State's challenged statements, the evidence at trial supports the certainty of Appellant's conviction. The evidence conclusively shows that Appellant stabbed Complainant; the only issue remaining for the jury's determination was whether Appellant acted in self-defense. The jury heard conflicting testimony on this point.

Through Detective Jimenez's testimony, the jury heard Appellant's account of what transpired between him and Complainant. According to Detective Jimenez, Appellant was "pretty distraught" when he heard that Complainant had died and initially said he stabbed her in self-defense after she "attacked" him with a knife. But later during their interview, Appellant told Detective Jimenez he thought Complainant was a "crackhead" that previously had threatened him. Appellant also told Detective Jimenez he "happened upon [Complainant] sitting on a chair and he gave her a little stab." Summarizing his thoughts on Appellant's statements, Detective Jimenez said it appeared that Appellant offered multiple versions of the events that occurred and sought to "chang[e] his story" and "look[]" for details to alter to explain away."

16

The jury also heard evidence detailing Complainant and Appellant's contentious relationship and their interactions that day. Faison said it was general knowledge among the apartment residents that Complainant and Appellant did not get along. According to Delgado, their family started barbecuing at 6:30 p.m. on the day of the incident and were "constant[ly]" interrupted by Appellant, who accused them of "trying to burn his apartment down." Lopez responded to Appellant's report of a fire and, after determining it was a "false alarm," called the incident in as a domestic dispute. Officer Hernandez responded to the domestic dispute call and, in her testimony, described Appellant as "belligerent," "upset," and "unreasonable." Appellant also told Officer Hernandez that "[a]s of tomorrow things are going to change" — a statement that Officer Hernandez perceived as a threat.

The video footage recorded by Saucedo sheds further light on Complainant and Appellant's relationship. In the video, Appellant can be heard asking Saucedo, "Should I kill 'em? Should I let her make it?" Saucedo interpreted these statements as referencing Complainant. Finally, Juneau testified that she witnessed Appellant confront Complainant while she was sitting in a chair outside his front door, "run inside," and then "run back outside and hit [Complainant] twice."

Finally, forensic scientist Gonzales testified that, of the three knives recovered from the scene, only one knife tested positive for DNA from Complainant and Appellant. Gonzales said further testing on this knife showed Complainant's DNA in a bloodstain.

"The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Simpson v. State*, 227 S.W.3d 855, 861 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Wesbrook v. State*, 29 S.W.3d

17

103, 111 (Tex. Crim. App. 2000) (en banc)). Considered together, this evidence provides a sufficient basis to support the jury's rejection of Appellant's self-defense claim. Therefore, this factor does not show that the trial court abused its discretion in overruling Appellant's motion for mistrial. *See Archie*, 340 S.W.3d at 739.

For these reasons, we overrule Appellant's first issue.

## II. Appellant's Rule 403 Objections

Appellant cites Texas Rule of Evidence 403 to support his second and fourth issues, both of which challenge the trial court's admission of certain evidence. Specifically, Appellant's second issue challenges the trial court's admission of Saucedo's video recording and, in his fourth issue, Appellant challenges the trial court's admission of a photograph showing blood collected from Complainant's chest cavity. After outlining the standard of review and applicable law, we consider these issues individually.

### A. Standard of Review and Applicable Law

"We review the trial court's decision to admit or exclude evidence, as well as its decision as to whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice, under an abuse of discretion standard." *Seidule v. State*, 622 S.W.3d 480, 489 (Tex. App.—Houston [14th Dist.] 2021, no pet.). A trial court abuses its discretion when its ruling lies outside the zone of reasonable disagreement. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

To be admissible, a trial court must first determine that the evidence is

relevant. *Henley v. State*, 493 S.W.3d 77, 83 (Tex. Crim. App. 2016). Relevant evidence is any evidence that has a tendency to make a fact more or less probable than it would be without the evidence that is also of consequence in the action. Tex. R. Evid. 401. Rule 403 provides that relevant evidence may nonetheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Using these factors, "Rule 403 requires exclusion of evidence only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value." *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001). Rule 403 favors the admission of relevant evidence, and we presume that the probative value of relevant evidence exceeds any danger of unfair prejudice. *See Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009).

> When undertaking a Rule 403 analysis, a trial court must balance:
>
> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

The first two *Gigliobianco* factors focus on the probative force of and the State's need for the evidence. *See id*. A trial court assesses these factors by asking the following questions: "Does the proponent have other available evidence to establish the fact of consequence that the extraneous misconduct is relevant to

19

show? . . . And is the fact of consequence related to an issue that is in dispute?" *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (en banc).

## B.    Saucedo's Video Recording

After he was placed in handcuffs following the stabbing, Appellant told Officer Perez he "grabbed the knife from [Complainant] and stabbed her" in "self-defense." Similarly, in his statements to Detective Jimenez, Appellant asserted that he did not intentionally attack Complainant but rather stabbed her in self-defense. Saucedo's video recording — by reflecting Appellant's thoughts with respect to Complainant shortly before the stabbing — was probative of Appellant's self-defense claim. *See* Tex. Penal Code Ann. § 9.31 ("a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force"); *see also Padilla v. State*, 254 S.W.3d 585, 594 (Tex. App.—Eastland 2008, pet. ref'd) (probative value of challenged testimony was "considerable" because, "[a]t a minimum, it combated [the defendant's] self-defense theory"). Moreover, because of the conflicting evidence relevant to Appellant's self-defense claim, the State had a significant need for additional evidence that would shed further light on Appellant's state of mind at the time of the incident. *See, e.g.*, *Scott v. State*, No. 05-16-01325-CR, 2018 WL 774219, at *4 (Tex. App.—Dallas Feb. 8, 2018, no pet.) (mem. op., not designated for publication) (Rule 403 did not mandate the exclusion of the defendant's entries in a notebook; rather, "the State had a need for the complained-of evidence because it showed appellant's state of mind at the time of stabbing").

Nor does the video recording suggest a decision on an improper basis or that it confused or distracted the jury from the main issues in the case. For the reasons stated above, the recording is directly relevant to Appellant's self-defense claim.

20

Finally, the presentation of the evidence did not consume an inordinate amount of time or merely repeat evidence already admitted. The video recording lasted less than a minute and Saucedo's testimony comprised only 50 pages of the over 700 pages of testimony.

For these reasons, the trial court did not abuse its discretion by admitting Saucedo's video recording over Appellant's Rule 403 objection. *See* Tex. R. Evid. 403; *Gigliobianco*, 210 S.W.3d at 641-42. We overrule Appellant's second issue.

### C. The Photograph of Blood Collected from Complainant's Chest Cavity

Autopsy photographs generally are admissible unless they depict mutilation of the victim caused by the autopsy itself. *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002) (en banc). Several factors may be considered in determining whether the danger of unfair prejudice substantially outweighs the probative value of photographs, including the number of exhibits offered, their gruesomeness, their detail, whether they are black and white or color, whether they are close-up, and the availability of other means of proof. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995) (en banc).

Here, the challenged photograph is fairly sterile and shows only a medical container filled with a substance identified as Complainant's blood. The challenged photograph also was the only exhibit admitted to show the extent of the bleeding caused by Complainant's injuries.

As Dr. Maclayton described in her testimony, the stab wound to the left side of Complainant's chest pierced her lung and heart — injuries causing substantial internal bleeding that pooled in Complainant's chest cavity. Because this photograph is relevant to show the nature and manner of Complainant's death, it suggests the trial court did not err in admitting it over Appellant's Rule 403

21

objection. *See, e.g.*, *Ripkowski v. State*, 61 S.W.3d 378, 392-93 (Tex. Crim. App. 2001) (the trial court did not err in admitting photographs of the victim's larynx after it had been removed from the victim's throat because "the photographs were highly relevant to the manner of death — in this case, manual strangulation"); *In re J.B.C.*, 233 S.W.3d 88, 95 (Tex. App.—Fort Worth 2007, pet. denied) (the trial court did not err in admitting a photograph that "depicted extensive hemorrhaging" underneath the complainant's skin on her skull; the photograph "depicted the full extent of [the complainant's] wounds and was important in determining the manner of death"); *Moreno Denoso v. State*, 156 S.W.3d 166, 179 (Tex. App.—Corpus Christi 2005, pet. ref'd) ("The autopsy and post-autopsy photographs in this case show the nature and the manner of the victim's death.").

Therefore, because the photograph's probative value is not substantially outweighed by the risk of unfair prejudice, the trial court did not err in overruling Appellant's Rule 403 objection. *See* Tex. R. Evid. 403; *Gigliobianco*, 210 S.W.3d at 641-42. We overrule Appellant's fourth issue.

## III.    Appellant's Medical Records

In his third issue, Appellant asserts the trial court erred in excluding his medical records because they contain statements made for medical diagnosis or treatment. *See* Tex. R. Evid. 803(4) (describing an exception to the rule against hearsay for a statement made for medical diagnosis or treatment).

After his interview with Appellant, Detective Jimenez transported Appellant to the hospital. Appellant sought to admit at trial approximately 100 pages of medical records from this hospital visit, arguing that they contained statements made for a medical diagnosis or treatment. The trial court ruled that the records were inadmissible.

22

After the jury returned a guilty verdict, Appellant made a bill of exception as to what evidence would have been added to the record via Appellant's medical records.  Appellant's counsel and the trial court had the following exchange:

| | |
|---|---|
| Trial Court: | I thought you said you didn't want them admitted.  Because we considered that issue a second time[3] and you said that you didn't care for them to be admitted. |
| Appellant's Counsel: | Judge, we had discussions about being able to enter in portions of the records, and we talked about the toxicology, and then we discussed that it would not make sense to enter stuff piecemeal.  So — |
| Trial Court: | We discussed the record and that it could be redacted, any double hearsay, any information that the law wouldn't allow to come in.  But I'll let you make the bill, but my recollection is we talked about it twice.  And the second time, my understanding is that you did not wish to have the record to come in even with the ability to — the Court redacting what would not be allowed under the rules of evidence.  So — but you can go ahead and make your bill. |
| Appellant's Counsel: | Yes, Judge.  That is correct, we made the decision that we would not want to enter the records with everything that had to be redacted out of it. |

Appellant again sought to admit the records in their entirety, which the trial court denied.  Appellant challenges this evidentiary ruling on appeal, which we review

---

[3] As Appellant noted in his appellate brief, this second discussion regarding the admission of Appellant's medical records is not included in the reporter's record.

for an abuse of discretion. *See Seidule*, 622 S.W.3d at 489.

"When a trial judge is presented with a proffer of evidence containing both admissible and inadmissible statements and the proponent of the evidence fails to segregate and specifically offer admissible statements, the trial court may properly exclude all of the statements." *Willover*, 70 S.W.3d at 847. Here, the proffered medical records contain both admissible and inadmissible statements.

First, the records show the results of Appellant's toxicology report and reflect that he tested positive for amphetamines and cannabinoids and had a blood alcohol content of 0.08. Other portions of the records contain Appellant's statement that he "hit a key bong two days ago but I do not do meth often." But evidence pertaining to Appellant's intoxication at the time of the stabbing was not relevant to any issues before the jury and would properly be excluded. *See* Tex. Penal Code Ann. § 8.04(a) ("Voluntary intoxication does not constitute a defense to the commission of a crime."); *see also, e.g.*, *Ramirez v. State*, No. 14-05-00184-CR, 2006 WL 1026926, at *9 (Tex. App.—Houston [14th Dist.] Apr. 20, 2006, pet. ref'd) (mem. op., not designated for publication) ("because voluntary intoxication is not a defense to assault, Dr. Salazar's testimony on that point would have been irrelevant").

Second, portions of the records contain self-serving statements made by Appellant regarding his version of what transpired with Complainant. *See Moore v. State*, 849 S.W.2d 350, 351 n.1 (Tex. Crim. App. 1993) (en banc) (Baird, J., concurring) ("out of court, self-serving declarations by the accused are ordinarily inadmissible"); *Sneed v. State*, 955 S.W.2d 451, 454 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (the reliability of statements made for medical diagnosis or treatment "significantly decreases" when "they are self-serving statements and sufficient time has elapsed for [the defendant] to reflect and fabricate an

24

explanation"). Specifically, the records show in numerous places that Appellant "states that he killed someone in self-defense." In another part of the records, Appellant is reported as saying "he had no intention of hurting anybody else and some are [sic] just happened." The trial court's exclusion of these self-serving statements would fall within its discretion. *See Moore*, 849 S.W.2d at 351 n.1; *Sneed*, 955 S.W.2d at 454.

For these reasons, portions of the proffered medical records contain inadmissible statements. Because Appellant did not segregate these portions of the records from those he sought to admit under Rule 803(4) as statements for a medical diagnosis or treatment, the trial court did not err in excluding the records in their entirety. *See Willover*, 70 S.W.3d at 847. We overrule Appellant's third issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/ Meagan Hassan
Justice


Panel consists of Justices Wise, Spain, and Hassan.
Do Not Publish — Tex. R. App. P. 47.2(b).